No. 32,129

EMMET COOPER, *Appellee*, v. NELLIE P. COOPER et al., *Appellants*.

(46 P. 2d 855)

Opinion filed July 6, 1935.

*Oscar Ostrum,* of Russell, for the appellants.

*George W. Holland, C. R. Holland, J. E. Driscoll,* all of Russell, *Bennett R. Wheeler, S. M. Brewster, J. L. Hunt, Margaret McGurnaghan, Ralph M. Hope* and *John H. Hunt,* all of Topeka, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This lawsuit originated as an action by Emmet Cooper, plaintiff, against his sister-in-law, Nellie P. Cooper, and her four minor children, for a sum of money 'he had paid out on their behalf as federal income taxes. It expanded into a cross action by Nellie P. Cooper for an accounting of a ten years' trusteeship exercised by Emmet Cooper (and A. D. Jellison) over the estate of the late Albert G. T. Cooper, of Russell county. Others interested in the estate were permitted to intervene.

The most pertinent and least controversial facts developed by the record were these:

Cooper, testator, had been a Russell county pioneer. He had accumulated 6,500 acres of land, some 1,700 acres of which were tilled and 4,800 acres of pasture. Except two isolated parcels of 640 acres and 480 acres, the Cooper lands formed one contiguous tract. A mile-strip quarter section belonging to Emmet Cooper was wedged into the Cooper lands on three sides and used as a part of them.

Cooper, senior, and wife resided on this spacious property. They had eight sons and two daughters. One of the sons had died before his father, leaving a minor son, Ray Cooper, who was separately provided for in his grandfather's will. Of the seven surviving sons, all but one, Oliver, had reached their majority ere their father died.

On the Cooper ranch were five sets of improvements, and as his sons grew up and married they took up their separate abodes in

those accommodations. There was a house on the Emmet Cooper quarter section and one of the sons resided there.

In the lifetime of the testator the ranch had been operated as a family affair in typical Kansas fashion. There was a large herd of cattle and horses and the usual equipment of farming machinery. Some of the tillable lands were farmed by the owner and some rented. The testator had also used his credit to carry on his farming and ranching operations and owed some $30,000 at his death.

Emmet Cooper, plaintiff, was the eldest son. He had gained some business experience as a grain dealer and banker, and enjoyed his father's confidence.

The elder Cooper died on December 15, 1919. His will, made a week before his death, was probated without delay. By its terms Emmet Cooper and A. D. Jellison, a local banker, were named as executors and were expressly exempted from giving bond, and (so far as permitted by law) they were exempted from making an inventory of the testator's assets and from accounting to the probate court. The estate was to be erected into a trust to endure for ten years, or longer if the testator's widow should outlive that period. Generous provision was made in her behalf. A bequest of $10,000 was made in behalf of the minor grandson, Ray Cooper. The will also made bequests of $1,000 to the Scottish Rite in Salina and $10,000 to the Masonic home in Wichita, but these were not to become effective until the end of the trust period.

In other respects the testator's sons and daughters were to share the estate on equal terms, but the proportions of the two daughters were to be erected into trust estates for their benefit, a detail of no present concern.

Certain portions of the will read:

"First. I appoint, make and constitute my son Emmet Cooper and A. D. Jellison the executors of this will and direct that no bond be required from them as such executors; and I further direct that neither be required to render any account or return any inventory of the assets of my estate into the probate court; and that as soon as the matters of my estate shall be closed in the probate court that the said Emmet Cooper and A. D. Jellison retain all of my estate as trustees . . . I empower my said executors to pay all of my debts, and if necessary so to do they are hereby fully empowered to sell and dispose of any real or personal property belonging to my estate without first obtaining any order from the probate or any other court, and to execute and make all needful papers as fully as I could if living.

"Second. After the payment of the debts against my estate by my executors, *I do give, bequeath and devise unto the said Emmet Copper and A. D.*

*Jellison all* the rest and residue of *my property,* real, personal and mixed and wherever situated, as trustees and in trust however for the uses and purposes as herein stated, as follows, viz.:

"A. *To pay any debts or obligations not paid by my said executors should any such debts exist.*

"B. Out of my property and the rents and profits and interest therefrom arising said trustees shall from time to time and as my said wife Nancy J. Cooper, needs or desires the same, pay to the said Nancy J. Cooper sufficient moneys for her ample support and comfort, enough to be allowed to her to enable her to travel and to have all needful help, nursing, company and all suitable clothing and all conveniences, so that she may have in everything, out of my estate as full support and enjoyment as she had during our marriage and before my death; the said Nancy J. Cooper not to account for any of the money thus paid to her for the uses and purposes mentioned. After paying to my wife, Nancy J. Cooper, the moneys as aforesaid any surplus of income or from interest, rents or otherwise my said trustees shall invest so that my estate may be enlarged in good and safe first-mortgage real-estate securities or other equally safe investments. If from any cause at any time or times the income from my estate shall not be sufficient for the use of my said wife, Nancy J. Cooper, during her natural life, then I empower my said trustees to sell any of my real estate or personal property for the purpose of obtaining at any time or times sufficient money for my said wife for the uses and purposes as herein stated; and in case of any sale, recitation in the instrument or instruments of conveyance or sale that the sale is made to obtain money for the use of said Nancy J. Cooper shall be taken as conclusive proof that the sale is for such purpose and the title conveyed shall be perfect as if made by myself, my wife joining therein, were I living. *My trustees shall in no event be held for any losses occurring from erroneous judgment,* nor shall they be responsible for the acts of any of their agents or attorneys in the management of my estate; it being my intention they shall exercise good judgment honestly in the discharge of the trust. In determining what is my property all money, property or other things at my death standing in my name or in the name of myself and Nancy J. Cooper, my wife, shall be taken and deemed to be a part of my estate, which shall pass to the trustees herein named."

The remainder estate was disposed of thus:

"All the rest of and residue of my estate real, personal and mixed wheresoever the same may be situated or found and of whatsoever it may consist, *after* the above legacies and bequests have been paid and *all the expenses of* probating this my last will and testament, and *carrying into effect the provisions of this will, have been paid by my executors or trustees,* I give, bequeath and devise, share and share alike, to the following-named persons, the same being sons and daughters of mine, to wit: Emmet Cooper, of Dorrance, Kansas; Lucian Cooper, of Russell county, Kansas; Ray Cooper, of Dorrance, Kansas; Ralph Cooper, of Russell county, Kansas; Samuel Evans Cooper, of Russell county, Kansas; Cecil Francis Cooper, of Russell county, Kansas; Oliver Perry Cooper, of Russell county, Kansas; Grace Belle Dague, of

Wichita, Kansas; and Gertrude Ruth Ward, of Lucas, Kansas, . . ." [Italics ours.]

When Emmet Cooper and A. D. Jellison qualified and entered upon their duties as executors the assets and liabilities of the testator were about as follows:

Assets consisting of lands valued at $157,000 and personalty consisting of 497 cattle, 40 horses and mules, 22 hogs and miscellaneous chattels valued at $67,000, a total valuation of about $224,000.

Debts due local banks, etc., about $30,000 and federal and other taxes, $3,030.06.

These figures are only approximations gleaned from the record, and are used here merely to aid in understanding the nature and status of the trust property, the administration of which was sharply called in question in this cross action precipitated by Nellie P. Cooper and the interveners.

The executors made no attempt to turn sufficient assets of the estate to pay off its debts. In lieu thereof they renewed promissory notes of the testator evidencing such indebtedness which was mostly held by the local banks in the neighboring towns of Wilson, Lucas and Ellsworth. One of the liabilities of the testator was a $4,000 mortgage to the Jellison Trust Co.

When Cooper died in December, 1919, one of the sons, Cecil Cooper, took charge of the ranch temporarily. He conducted its business for about three months and drew checks to pay current expenses through some arrangement with the executors and as their agent.

In March, 1920, Emmet Cooper took personal charge of the ranch, and he and three of his brothers, Ralph, Lucian and Cecil, operated it together for the ensuing season—farming and cattle raising—on an agreed basis that the estate should receive one half of the net profits and the four brothers should divide the other half equally. By that arrangement the share of each brother was $943.88. Each of them received that amount, but Emmet left his share in the estate, merely keeping account thereof as an item due himself. At one time and another he advanced or loaned other sums to the estate through an informal understanding with Jellison, his fellow trustee. The two sisters, also, upon occasion, loaned money to the trustees to finance the ranching activities. After the first year succeeding the death of the testator, Emmet rented about 1,300 acres of the farming lands and 500 acres of pasture to five of his brothers

and a brother-in-law separately; and he also rented 225 acres to strangers. He operated the remaining lands as an estate project himself, hiring help as needed, buying, selling, making improvements, the trustees' interpretation of their trust powers being that they should conduct the ranch as a going concern.

The testator's widow continued to reside in the principal farmhouse. She managed her poultry, gardening and dairy activities very much as she had done when her husband was alive. She died in 1926, after which time some of the members of the family expressed the desire that the trustees should wind up the estate; but that was not done. The trust period had to run for ten years—until 1929.

In the course of the executorship and the trusteeship which succeeded it, Cooper and Jellison were not as candid with the beneficiaries as they should have been. They made annual reports to them, but these were not so clear and explicit that the beneficiaries —the brothers and sisters of plaintiff (and defendant Nellie P. Cooper, after the death of her husband, Ray Cooper, in 1927)— could learn therefrom that the trustees were permitting one of their number, Emmet Cooper, to charge the estate $1,500 per annum for his services, and that the other, A. D. Jellison, received the lump sum of $500 for his services and expenses. Neither did the annual reports show that Emmet Cooper was loaning his own money to the trust estate and charging interest therefor. The reports did show that the trustees were borrowing money and paying interest to finance the activities of the estate. These reports also showed that the trustees were using rented lands, but they did not specifically state that such rented lands, or part of them, included the quarter section owned by Emmet Cooper nor what amount of rent the trustees were paying for it. At various times during the trusteeship Emmet Cooper was heard to say that he was getting no pay for his services as trustee, but at other times all or most of the members of the family were otherwise apprised long before the trust period terminated. Towards its close two or three auction sales were had and all the personalty (except some temporarily unsalable chattels—diamonds,corporate stocks, roofing and prairie-dog poison) were disposed of. Following these sales and at the termination of the trust period, the trustees divided the net proceeds among the beneficiaries, taking from each of them a written instrument, of which the following is an example:

"RECEIPT

"This is to acknowledge receipt of the sum of $1,336.90 and $12.28 for chairs, etc., paid to the undersigned, by Emmet Cooper and A. D. Jellison, trustees of the estate of Albert G. T. Cooper, deceased, and this is to acknowledge that the same is full and final payment of any and all sums of money or property, both real or personal, due me from said trustees of said estate. And this is to acknowledge that said trustees, their heirs or successors, are herewith released from any and all claims or liabilities, by me, and that I accept the said above amount of money as a full and final settlement for my share in said estate of Albert G. T. Cooper, deceased.

"Witness my hand this 31st day of July, 1930. MRS. NELLIE P. COOPER."

Nellie P. Cooper executed a similar instrument for a like amount as guardian for her four minor children. The probate court approved the execution of this latter receipt.

At the time these receipts and acknowledgments were made the parties concerned knew that Emmet Cooper still held control of the unsalable chattels, and it was informally understood that if and when they could be marketed there would be a special accounting in relation thereto; also that there was still an unsatisfied demand on the part of the federal government for additional federal income taxes in the sum of $2,750 which Emmet was to satisfy on the best terms available and the beneficiaries of the trust estate were to reimburse him proportionately therefor. In other respects the trust estate was closed in July, 1930. The extensive lands had already been apportioned among the beneficiaries.

In its exhaustive details and conclusions the trial court found that Emmet Cooper satisfied the government's demand for $2,750 by payment of $2,259.40; that the unsold diamonds, dog poison, etc., were worth $500; that the fair rental value of Emmet Cooper's land to the estate was $100 per annum and ought to be reduced to that amount; that Emmet Cooper's services to the estate as trustee were worth $550 per annum and his services to the estate as farmer and day laborer were worth $900 per annum, or $1,450 *in toto*, rather than $1,500 per annum as charged by Emmet Cooper and sanctioned by his fellow trustee—this slight reduction being based on the failure of Emmet Cooper to keep his accounts with sufficient clarity and precision so that anybody concerned could understand their details readily.

The record is long; the trial court's findings of fact extend to thirty-four closely printed pages of the abstract. Its conclusions of law cover five additional pages; but our foregoing summary may

suffice for the purposes of this review. If further details need our consideration they will be stated as we proceed.

By the judgment, Nellie P. Cooper and her children were required to pay to plaintiff their proportionate shares of federal income taxes in the aggregate sum of $291.32; the intervener, Cecil Cooper, was required to do likewise. The other interveners were similarly charged with their proportionate shares of the federal income taxes paid in their behalf. In behalf of Nellie P. Cooper and her children and the interveners (other than one sister, who, apparently, disclaimed), the court required Emmet Cooper to pay to each of them their proportionate shares of the value of the diamonds, etc., together with their proportionate shares of the abatements made in Emmet Cooper's charges for the trust estate's use of his quarter section of land and for his services as trustee. Costs of the litigation were charged proportionately against all the litigants.

All parties appeal.

Touching first upon the errors urged by defendants and interveners as appellants, they contend that since the executors reported to the probate court that all the testator's debts were paid, that matter should have been regarded as settled for all time to come. It is quite correct that within its jurisdiction a final order of the probate court which is not appealed is as binding and conclusive as that of any other judicial tribunal, but appellants close their eyes to the broad and unusual powers of these executors and trustees. They were authorized to pay the testator's debts as executors, to be sure; but they were likewise authorized as trustees to pay any debts or obligations which as executors they had failed to pay. In the concluding paragraph of the will this broad power is repeated—"after all expenses," etc., "have been paid by my executors or trustees," the residue is given and devised to the beneficiaries. The fair meaning of such a broad and unusual power was that the executors were vested with discretion in dealing with those debts; and the refunding of them as obligations of the trustees was a reasonable disposition of them, especially in the view this court takes of the powers of the trustees to carry on the farming and ranching activities of the estate. The trial court was of opinion that the trustees were not thus empowered, that they should have sold off the cattle, horses, hogs and farming equipment, paid the debts in cash, and sold or rented the lands to strangers, and should have retired from

the activities and the attendant risks of operating the ranch as a going concern. This court holds otherwise. In broad outlines the trust estate was managed as Cooper, senior, intended. (65 C. J. 692, 693.) His first concern was for his widow, the mother of these litigants, that she should be provided for with "as full support and enjoyment as she had during our marriage and before my death." Nancy J. Cooper was a farm wife and mother. As her sons and daughters matured and married they settled about her in homes erected on the family estate. They were farm-bred folk. It seems to us that to have required Nancy J. Cooper to remove from the farm home so that it might be rented to a stranger and that her sons should have had to compete with strangers for the privilege of renting portions of the Cooper ranch, would have been a distorted and inexcusable interpretation of the powers conferred upon the trustees. If this court had any doubt on this score it would be dissolved when we consider that the Cooper ranch was carried on as a going concern for ten years without a valid protest or question on the part of anyone concerned. The operative interpretation of the trustees' powers on the subject was unanimous by everybody concerned for ten years. The sons farmed the land on shares; they bought and sold and dealt with the trustees in respect to farm products; they hired their services at various times to the trustees and received compensation therefor. The daughters, mature and married, returned betimes to the ranch home and received wages from the trustees for their services, and even loaned their own money at interest to the trustees.

We note that in 1924 the trustees had an intimation from a competent lawyer that there was a question about their right to operate the ranch as a going concern—but that was no more than indicative of a lawyer's commendable conservatism in passing on questions of law. A good way to have settled any question of the scope of the trustees' powers would have been to have had it adjudicated by timely action at the inception of the trust undertaking. Touching the trial court's conclusion that the trustees were not authorized to operate the ranch as a going concern, that court's final conclusion that the defendants and interveners were estopped to complain of such a course leads back to about the same legal conclusion as if the powers of the trustees had been construed in accordance with our view. (*State, ex rel., v. Iola Theater Corp.*, 136 Kan. 411, 414, 15 P. 2d 839.)

Appellants next contend that the trustees had no right to rent the

quarter section owned by Emmet Cooper and to pay rent therefor. We hold otherwise. This tract apparently had been used as a part of the ranch in the lifetime of the testator. It was situated so that it would have been expensive to the trustees as well as inconvenient to exclude it. And the trustees violated no rule of law in paying rent for it; and the amount they did pay has been subjected to the trial court's scrutiny with a result which appellants, at least, cannot fairly complain of.

Touching the point that one of the trustees, Emmet Cooper, loaned money to the estate and charged interest thereon: This court does not approve of such practice. It does appear, however, that he charged a lower rate of interest than the trustees were paying for bank loans to finance the ranching activities, and so this breach of the proprieties by the trustees in this instance did the appellants no wrong.

Appellants next make the contention that the executors or trustees were not entitled to charge for their services. We find no intimation in the will to the contrary. It would be curious indeed if the testator intended that his executors and trustees should serve for ten years without pay. Appellants do have a talking point against the trustees where they, as executors, did not ask the probate court for an allowance, but assumed to fix it in their own discretion as trustees. But the broad powers vested in them excused, if it did not justify, the course they took. Moreover the trial court has reviewed this matter, and has decided what fair compensation for the services rendered should be, and has approved trustee Jellison's compensation at $500 *in toto*, and Emmet Cooper's at $450 per annum as trustee and $900 per annum for his services as farmer and farm laborer in the operation of the trust property. The result is that ultimately the court and not the trustees determined their compensation.

Appellants also have a talking point against the executors and trustees on the trial court's finding No. 17, which reads:

"From January 1, 1920, to March 15, 1922, the estate of A. G. T. Cooper sustained a loss of from $16,500 to $20,000 by reason of the depreciation in the value of the livestock and other personal property belonging to the estate during said period of time."

But this is no more than a talking point. It is easy to be wise after the event. What Kansas farmer or ranchman, trustee or other functionary, would have continued to carry on his business activities in the years immediately succeeding the World War, if the calamitous shrinkage in agricultural values could have been fore-

seen? The executors and trustees were authorized to sell the lands of this ranch. . If they had sold the Cooper lands at the ruinous prices which followed the slump of cattle prices, the appellants would have 'a real grievance to talk about! Appellants may have lost something because the livestock was not sold before prices fell; but quite as obviously they were saved a very substantial amount when the executors and trustees did not literally reduce the Cooper estate to money and invest the same "in good and safe first-mortgage real-estate securities or other equally safe investments," as the will authorized them to do. In our judicial experience within the last few years we have frequently seen the tragic predicament of beneficiaries of trust estates where trustees pursued such policies, and have seen such "first-mortgage securities" and "equally safe investments" wither into worthlessness in the unforeseeable mutations of the post-war era.

In presenting this appeal the important fact is largely overlooked by appellants that there were two trustees, A. D. Jellison as well as Emmet Cooper. Appellants have seen fit to ignore Jellison's part in the execution of this trust, and have chosen to deal with Emmet Cooper as the one villain in the piece. But Jellison was impleaded in this lawsuit. He was equally responsible with Emmet Cooper for whatever was done or omitted by the trustees, although the active work of operating the Cooper ranch devolved on Emmet Cooper. The trial court saw fit to render no judgment against Jellison, approved his charges of $500 for his services as trustee; appellants made no objection thereto; and they do not now complain of the trial court's disposition of this cause as to him. It is elementary law that a general release without qualification of one of two trustees, with respect to improper management of a trust estate, is a release of the other trustee also.

In *Blackwood v. Borrowes*, 4 D. & War. Ch., 441, the suit, among other matters, was to fix liability upon the estate of a deceased trustee for breach of trust. The claim against the surviving co-trustee had been compromised and settled. The high court of chancery held that the release of one of the trustees operated as a release of the personal representatives of the deceased trustee. The Lord Chancellor said: ·

"But it is said, why is not the plaintiff to have relief against Colonel Leslie's estate? He, no doubt, was bound in respect of the breach of trust, and he or his personal representative might have been made responsible, if the plaintiff had not estopped herself from the relief which she now seeks. . . . If

two trustees are liable for a breach of trust, and the *cestui que trust* says to one, 'I release you from all liability in respect to certain securities, and I am willing to allow the money to remain upon those very securities,' the case does not rest upon mere technical grounds; if she had said to Mr. Blackwood, 'I release you, but I do not intend to accept the securities, or to give up my right to make Colonel Leslie answer for his default,' the question would have been a different one, and I am not called upon to consider it. As the case stands, I think it very clear that the deed of July, 1839, operated not only as a release of Blackwood, but also as an acceptance by the plaintiff of the securities." (pp. 476, 477.)

And so here. This court is not called upon to put its seal of approval on any of the criticized acts of the trustees. At the close of the trust period the beneficiaries accepted their proportionate shares of the personal estate and executed instruments acknowledging the sums received as full and final settlement of their shares of the Cooper estate. Those instruments have not been set aside. They could not be set aside without procuring a judgment to that effect against the two trustees. (65 C. J. 663, 664.)

Of necessity, therefore, so much of Emmet Cooper's cross-appeal as relates to the reduction of his compensation as trustee and of the sum allowed him as rent of his quarter section is well taken. Those items were involved in the accounts of the trust estate; and since no judgment was rendered against the trustees those items could not become the basis of a judgment against Emmet Cooper personally.

However, this conclusion does not wholly relieve Emmet Cooper from the judgment against him. At the time the estate was wound up, July 31, 1930, and in order to avoid deferring that matter to some indefinite future time, not only was it agreed between Emmet Cooper and the beneficiaries that they would repay him personally for their proportionate shares of the federal income tax due from the estate; but also that he personally—not the trustees—held certain chattels undisposed of, diamonds, dog poison, etc., for which, impliedly, he was to account at some future time. Both these arrangements were made by the parties concerned with Emmet Cooper personally, not with the trustees. And so, not only must Nellie P. Cooper and the interveners pay Emmet Cooper their *pro-rata* share of the income taxes, but he must pay or account to them for their proportionate shares of the value of the chattels which by agreement remained in his hands after the trust estate was settled. In other respects the judgment against plaintiff must be vacated.

It follows that in this appeal the judgment is affirmed, and on the cross-appeal it is remanded for modification in accordance herewith.